MDR

1
2
3
4
5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8

9    Taryn Christian,                          No.   CV 21-00733-PHX-DWL (ESW)

10                        Plaintiff,

11   v.                                        **ORDER**

12   CoreCivic, et al.,

13

14                        Defendants.

15

16        On April 26, 2021, Plaintiff Taryn Christian, who is confined in CoreCivic's
17   Saguaro Correctional Center in Eloy, Arizona, filed a pro se civil rights Complaint pursuant
18   to 42 U.S.C. § 1983 and an "Ex Parte Request for Stay/Hold in Abeyance."  In a May 7,
19   2021 Order, the Court denied the Ex Parte Request and gave Plaintiff thirty days to either
20   pay the administrative and filing fees or file a complete Application to Proceed In Forma
21   Pauperis.
22        On June 3, 2021, Plaintiff paid the filing and administrative fees.  In a July 12, 2021
23   Order, the Court dismissed the Complaint because Plaintiff had failed to state a claim.  The
24   Court gave Plaintiff thirty days to file an amended complaint that cured the deficiencies
25   identified in the Order.
26        On August 2, 2021, Plaintiff filed a First Amended Complaint (Doc. 7).  The Court
27   will order Defendants Thomas, Griego, and Lopez to answer the First Amendment claim
28   in Count One; order Defendant Griego to answer Count Two; give Plaintiff an opportunity

1  to discover Defendant Trinity Food Service Supervisor Unknown's actual name; and

2  dismiss the remaining claims and Defendants without prejudice.

3  **I.       Statutory Screening of Prisoner Complaints**

4          The Court is required to screen complaints brought by prisoners seeking relief

5  against a governmental entity or an officer or an employee of a governmental entity.  28

6  U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff

7  has raised claims that are legally frivolous or malicious, that fail to state a claim upon which

8  relief may be granted, or that seek monetary relief from a defendant who is immune from

9  such relief.  28 U.S.C. § 1915A(b)(1)–(2).

10         A pleading must contain a "short and plain statement of the claim *showing* that the

11  pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does

12  not demand detailed factual allegations, "it demands more than an unadorned, the-

13  defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678

14  (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere

15  conclusory statements, do not suffice."  *Id.*

16         "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a

17  claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*,

18  550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content

19  that allows the court to draw the reasonable inference that the defendant is liable for the

20  misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for

21  relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial

22  experience and common sense."  *Id.* at 679.  Thus, although a plaintiff's specific factual

23  allegations may be consistent with a constitutional claim, a court must assess whether there

24  are other "more likely explanations" for a defendant's conduct.  *Id.* at 681.

25         But as the United States Court of Appeals for the Ninth Circuit has instructed, courts

26  must "continue to construe *pro se* filings liberally."  *Hebbe v. Pliler*, 627 F.3d 338, 342

27  (9th Cir. 2010).  A "complaint [filed by a pro se prisoner] 'must be held to less stringent

28

1  standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551

2  U.S. 89, 94 (2007) (per curiam)).

3  **II.      First Amended Complaint**

4         In his three-count First Amended Complaint, Plaintiff names as Defendants former

5  Warden Todd Thomas, former Assistant Warden Benjamin Griego, former head doctor

6  Michael Hegmann, former Nurse Practitioners Michelle McCray and Cathy Fuller,

7  Assistant Warden Jody Bradley, Nurse Practitioner LaDeana Morgan, Nurse/Medical

8  Supervisor E. Barajas, Medical Director Doctor Caroline Mee, Hawaii Contract Monitor

9  Howard Komori, onsite Contract Monitor Jennifer Bechler, Trinity Food Service

10  Supervisor Unknown, Chaplain M. Lopez, and Grievance Officer J. Valenzuela.  Plaintiff

11  seeks monetary damages.

12         In **Count One**, Plaintiff alleges a violation of his rights to equal protection and the

13  free exercise of his religion.  He claims he has been a practicing Jewish inmate for over ten

14  years, but that for the past two years, he has been unable to practice his religious beliefs,

15  attend services, eat a Kosher diet, or participate in Passover or Jewish fasts.

16         Plaintiff asserts he was "approved for Passover" in 2019, but halfway through

17  Passover, he was "cut off" because he did not wake up for breakfast at 4:00 a.m.  He

18  contends a chaplain explained that "they can[']t cut you off for missing breakfast" and

19  immediately e-mailed the kitchen to place Plaintiff "back on the list."  Plaintiff alleges that

20  at dinner, Defendant Trinity Food Service Supervisor Unknown told Plaintiff that although

21  he knew that the chaplain had put Plaintiff back on the list, Plaintiff "ain[']t getting it

22  tonight" because Defendant Trinity Food Service Supervisor Unknown had not updated

23  his list.  Plaintiff claims he complained to Defendant Griego, who was responsible for

24  overseeing the kitchen and had to approve inmates being taken off a religious diet.  He

25  alleges Defendant Griego called him a "fake jew" and would not put Plaintiff back on the

26  religious diet.

27         Plaintiff asserts Defendant Valenzuela violated his religious rights when he denied

28  Plaintiff's grievance.  He claims Defendant Valenzuela denied the grievance because

Plaintiff "didn[']t follow the process" and explained to Plaintiff that "he can[']t approve it for fear of being fired" by Defendant Griego.  Plaintiff alleges Defendant Valenzuela "ignore[ed] the evidence" because he feared retaliation from Defendant Griego.

Plaintiff contends that when he appealed, Defendant Thomas said "it will be addressed at the next scheduled grievance," but "[n]othing happened."  He alleges Defendant Thomas violated Plaintiff's right to practice his religious beliefs by "allowing his staff to deny [Plaintiff the religious diet] for no legitimate reason."  Plaintiff claims the chaplain quit shortly thereafter, stating that Defendant Griego "would not allow him to do his job."  Plaintiff alleges he spoke to Defendant Komori, "who did nothing," and wrote to Defendant Bechler, who never responded.

Plaintiff asserts that he subsequently submitted multiple requests for Defendant Lopez to put him on the kosher diet and requested to participate in Passover during 2020, but Plaintiff never received an answer.  He contends that when he requested to participate in Passover during 2021, Defendant Lopez told Plaintiff that he had "filled out a . . . declaration of religious preference to identify as 'Christian' in 2019."  Plaintiff claims he has never changed his religion and, when he asked Defendant Lopez for a copy of the declaration, Defendant Lopez claimed he could not find it.  He alleges Defendant Lopez also stated that Plaintiff had not participated in any Jewish holy days during 2020 and that "to participate, one must be active in that particular faith for at least six months prior to the event."  Plaintiff claims he was not permitted to participate in any Jewish events or holy days because the prison had changed his religious preference without his knowledge and then refused to answer his requests.  He alleges other inmates on the Kosher diet also unknowingly had their faith changed to "Christian" so the facility could limit the number of Kosher meals served.  Plaintiff contends the warden subsequently approved Plaintiff's appeal and stated that Plaintiff was "being changed back to the Jewish faith."

In **Count Two**, Plaintiff alleges he was subjected to retaliation in violation of the First Amendment.  Plaintiff claims he filed a grievance, but Defendant Valenzuela did not answer it, so he filed a complaint with Defendant Bradley, who gave it to Defendant

Griego. Plaintiff contends he was called to "OPS," where Defendant Bradley instructed him to go into Defendant Griego's office. He alleges that Defendant Valenzuela was already in Defendant Griego's office. Plaintiff claims Defendant Griego told Plaintiff to sit in a chair and then yelled and swore at Plaintiff with his finger inches from Plaintiff's face; threatened Plaintiff; threw the grievance at Plaintiff and told Plaintiff that if he filled out the grievance, Defendant Griego would put Plaintiff "so far in the back" that a senator from Hawaii would be unable to get Plaintiff out; grabbed the grievance out of Plaintiff's hands; told Plaintiff to get out of his office before he put Plaintiff in segregation; and then tore up Plaintiff's grievance.

Plaintiff claims Defendant Bradley violated his First Amendment rights by "allowing [Defendant] Griego to retaliate against him for filing a grievance." Plaintiff contends Defendant Griego was "the moving force" behind the threats. He also claims Defendant Valenzuela could have told the warden or CoreCivic's corporate officers that Defendant Griego was threatening inmates for filing grievances.

In **Count Three**, Plaintiff raises an Eighth Amendment claim regarding his medical care. He alleges that on April 1, 2018, he was taken to the medical department after he blacked out and had a seizure, and the nurse told him that he was probably just dehydrated. Plaintiff contends that since this seizure, he has had dizziness, atrial fibrillation, blurry vision, pressure on his left eye, shortness of breath, numbness in his hands and feet, ringing in his ears, pain in his neck and back, weakness in his arms and legs, and a loss of two inches of height.

Plaintiff submitted a medical request and was seen by Defendant Fuller on May 5, 2018. Two days later, when he was back at the medical department because he was experiencing pain and dizziness, Defendant Fuller came by while a nurse was examining Plaintiff and asked why Plaintiff had returned. Plaintiff claims Defendant Fuller told the nurse to leave, felt Plaintiff's neck, and informed Plaintiff that there was nothing wrong. Plaintiff alleges that when he "explained the blood in [his] eye on the 4-1-18 event," Defendant Fuller stated that this was "impossible," that Plaintiff must have been punched

in the eye and did not want to report it, and that she did not "have time for this." She told Plaintiff to leave.

Plaintiff contends he saw Defendant Hegmann on June 7, 2018, and Defendant Hegmann ordered a computerized tomography scan (CT scan) to confirm that Plaintiff did not have a tumor. Plaintiff claims he "informed [Defendant Hegmann] what [Plaintiff] thought was wrong," and Defendant Hegmann told Plaintiff that if there was no brain tumor, they could conduct additional tests "to figure out what[']s going on." Plaintiff asserts, however, that after the CT scan indicated that there was no brain tumor, Defendant Hegmann told Plaintiff that there was nothing wrong, would not see Plaintiff again, and denied Plaintiff's July 2 and 10, 2018 requests to see a doctor.

Plaintiff saw Defendant McCray on September 3, 2018. He claims he had to argue with her to get an x-ray of his thoracic spine, insisting that there was something wrong there because of the pain he was in. Plaintiff alleges the x-ray showed that there was "[b]one mineralization present" and a blood test showed he was not getting nutrients in his bones. Plaintiff contends that when he met with Defendant McCray on September 18, 2018, she said that his "tests were great/nothing wrong." Plaintiff confronted her, told her that his x-ray and blood test were not normal, and "argue[d] for nutrients for the bones." Plaintiff asserts Defendant McCray showed him the computer system and explained that the "red, sad face" meant that "medications/supplements are not to be given," the "corporate office doesn[']t allow [them] because of cost," and "they are making her job very hard to treat [the inmates]." Plaintiff claims that when he demanded calcium for his bones, she said that she could give him calcium if he felt he needed it and told him to "pray, meditate, read and walk."

Plaintiff alleges he saw Defendant McCray on January 7, 2019, and told her that he had been taking glucosamine from the commissary for the last three months and that it had helped his spine and had almost completely eliminated his dizziness and pain. She told him to "continue taking it then." Plaintiff asserts he informed her that the commissary had stopped selling it and asked her to prescribe it, but she stated that "the higher ups won[']t

approve it because it[']s too expensive." He claims they got into an argument about the medical department being more concerned with profit than treatment, and Plaintiff told Defendant McCray that he would be filing a grievance "if this continues." Plaintiff contends Defendant McCray "ran out" and Defendant Morgan came in and told Plaintiff to leave the medical department because they did not have time to go over all of his symptoms and had other inmates to see, although the medical unit was empty.

On February 6, 2019, Defendants McCray and Morgan spoke to Plaintiff about a complaint he had filed, allegedly telling him that his tests "don[']t mean anything," he was "just getting old," osteoporosis was from aging, and there is pain associated with aging. He claims Defendants McCray and Morgan told him that his continual complaining was a sign of mental illness and that they would not see him again unless he saw "the psych." He also alleges that Defendant McCray denied showing him the sad face on the computer and that his medical file indicates Defendants McCray and Morgan witnessed him taking deep breaths and having a hard time breathing during the appointment.

Plaintiff claims he filed a grievance on February 13, 2019, but his appeals were denied. He claims Defendant Mee denied a grievance he had filed with the State of Hawaii and she stated that Plaintiff's improvements from glucosamine "were from the 'placebo' effect."

Plaintiff alleges that after a blood test on June 10, 2019, a nurse practitioner indicated the test "shows problem with the bones, assessment 'vertigo.'" He claims that when he spoke with Defendant Hegmann on December 12, 2019, Defendant Hegmann indicated that Defendant Morgan had told him that Plaintiff was a hypochondriac and that there was no connection between the blood in his eye and Plaintiff blacking out and having a seizure. Plaintiff claims that when he asked Defendant Hegmann to explain the blood tests and x-ray, Defendant Hegmann "got very upset" and told Plaintiff that he did not "have to explain anything" to Plaintiff, the meeting was over, and he would not see Plaintiff again on this issue. Plaintiff alleges he told Defendant Hegmann, "if I black out and have another seizure[,] you will be seeing me." Plaintiff claims Defendant Hegmann said he

would "take that as a threat" and, as he walked into Defendant Morgan's office and slammed the door, said that he wanted Plaintiff "put in seg[regation]."

Plaintiff alleges that on May 28, 2021, a new doctor ordered an "'allergy' diet due to headaches from [monosodium glutamate]." Plaintiff contends prior requests for this diet had been denied by nurse practitioners and Defendant Hegmann, who had told Plaintiff to "self[-]select" because "the facility doesn[']t like us writing too many diets." Plaintiff claims the new doctor also authorized Plaintiff to see a neurologist because of the numbness in Plaintiff's hands and feet, the neurologist ordered a magnetic resonance imaging (MRI) scan of Plaintiff's head and neck, and Plaintiff is waiting for the MRI.

Plaintiff alleges he has been dizzy every day since April 1, 2018, and has blacked out three times, has been in pain for three years, and sometimes has difficulty breathing. He claims that because of a lack of treatment, his numb feet are getting worse, which sometimes makes it hard to walk.

Plaintiff alleges Defendant Fuller violated his Eighth Amendment rights by telling the nurse to leave and by telling Plaintiff to leave the medical department. Plaintiff asserts Defendant Hegmann violated his Eighth Amendment rights when he refused to see Plaintiff, threatened Plaintiff with segregation, "would not treat [Plaintiff] because of costs," and threatened Plaintiff when he asked Defendant Hegmann to correct the "inaccurate statement" Defendant Hegmann he had written in Plaintiff's medical file that "it[']s all for attention."

Plaintiff claims Defendant McCray violated his Eighth Amendment rights by "lying" about Plaintiff's test results, ignoring test results that indicated a possible problem, ignoring the fact that she witnessed Plaintiff having a hard time breathing, failing to properly treat Plaintiff due to profit margins, and telling him to meditate and pray. Plaintiff makes the same allegations against Defendant Morgan and also alleges that she violated his Eighth Amendment rights by (1) placing his health at risk and prolonging his pain when she made him leave the medical department without hearing his symptoms because she

was too busy and (2) by telling other medical staff that he was a hypochondriac, although this contradicts his tests showing a bone problem.

Plaintiff alleges Defendants Barajas and Thomas denied his grievances and allowed staff "to choose profits over treatment."  He claims Defendant Mee violated his Eighth Amendment rights by claiming his improvements from taking glucosamine were due to a placebo effect, ignoring his test results and his requests to see a specialist "while acknowledging [atrial fibrillation]," and "ignoring the seriousness that this started when [Plaintiff] black[ed] out and had a seizure on a camera and had blacked out twice since."

**III.    Discussion of First Amended Complaint**

Although pro se pleadings are liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), conclusory and vague allegations will not support a cause of action.  *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982).  Further, a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled.  *Id.*

To state a valid claim under § 1983, plaintiffs must allege that they suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant.  *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).  "A plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

**A.    Count One – Religion**

To state a First Amendment, free-exercise-of-religion claim, a plaintiff must allege that a defendant substantially burdened the practice of the plaintiff's religion by preventing him from engaging in a sincerely held religious belief and that the defendant did so without any justification reasonably related to legitimate penological interests.  *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

. . . .

. . . .

### 1.     Defendants Komori and Bechler

Plaintiff alleges Defendant Komori "did nothing" after speaking to Plaintiff and that Defendant Bechler did not respond when Plaintiff wrote to him.   These vague and conclusory allegations are insufficient to support a conclusion that either Defendant prevented Plaintiff from engaging in a sincerely held religious belief.  Thus, the Court will dismiss without prejudice Plaintiff's First Amendment claims against Defendants Komori and Bechler.

### 2.     Defendant Valenzuela

Under Ninth Circuit law, a defendant can be liable for failure to act. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).   Generally, whether a defendant's denial of administrative grievances is sufficient to state a claim depends on several facts, including whether the alleged constitutional violation was ongoing, *see e.g.*, *Flanory v. Bonn*, 604 F.3d 249, 256 (6th Cir. 2010), and whether the defendant who responded to the grievance had authority to take action to remedy the alleged violation, *see Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009).

Plaintiff asserts Defendant Valenzuela violated his religious rights when he denied Plaintiff's grievance.   Plaintiff does not identify the information he provided Defendant Valenzuela in the grievance or whether Defendant Valenzuela's explanation that Plaintiff "didn[']t follow the process" was accurate.   Moreover, it is unclear whether Defendant Valenzuela had any authority to remedy to alleged First Amendment violation if he would have been fired for attempting to remedy it.  Absent more, Plaintiff's allegations are too vague and conclusory to state a First Amendment claim against Defendant Valenzuela. Thus, the Court will dismiss without prejudice Plaintiff's First Amendment claim against Defendant Valenzuela.

### 3.     Defendants Trinity Food Service Supervisor Unknown, Griego, Thomas, and Lopez

Liberally construed, Plaintiff has stated First Amendment claims against Defendants Trinity Food Service Supervisor Unknown, Griego, and Lopez.   The Court will require

Defendants Griego, Thomas, and Lopez to answer the First Amendment claims in Count One.  Although Plaintiff has stated a claim against Defendant Trinity Food Service Supervisor Unknown, the Court will not require service on Defendant Trinity Food Service Supervisor Unknown at this time because it is, in most instances, impossible for the United States Marshal or his designee to serve a summons and complaint upon an anonymous defendant.  However, the Court will not dismiss the claim against Defendant Trinity Food Service Supervisor Unknown at this time.

The Ninth Circuit has held that where identity is unknown prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds.  *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (citing *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)).  The Court will allow Plaintiff 120 days in which to discover the actual name of Defendant Trinity Food Service Supervisor Unknown, through subpoena or otherwise, and to substitute the Defendant's actual name by filing a "notice of substitution."  *See Wakefield*, 177 F.3d at 1163.  The Court may dismiss without prejudice Defendant Trinity Food Service Supervisor Unknown if Plaintiff fails to timely file a notice of substitution, unless Plaintiff seeks and is granted an extension of time.

**B.     Count One – Equal Protection**

The Equal Protection Clause requires the State to treat all similarly situated people alike.  *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Generally, "[t]o state a claim . . . for a violation of the Equal Protection Clause . . . [,] a plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class."  *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  Where religious rights are at issue in an equal protection claim, a prisoner must show he was not "afforded a reasonable opportunity to pursue his faith as compared to prisoners of other faiths" and that "officials intentionally acted in a discriminatory manner."  *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997), *abrogated on other*

*grounds by Shakur*, 514 F.3d at 884-85.  Plaintiff's allegations do not support a conclusion that any Defendant intentionally denied him a reasonable opportunity to pursue his faith as compared to prisoners of other faiths.  Thus, the Court will dismiss without prejudice the equal protection claim in Count One.

### C.   Count Two

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).  A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005).  "[T]he mere *threat* of harm can be an adverse action, regarding of whether it is carried out because the threat itself can have a chilling effect."  *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) (emphasis in original).  Moreover, "an objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill *or* silence a person of ordinary firmness from future First Amendment activities.'"  *Id.* at 1271 (quoting *Rhodes*, 408 F.3d at 568-69).

Liberally construed, Plaintiff has stated a First Amendment retaliation claim against Defendant Griego.  The Court will require Defendant Griego to answer Count Two.

Plaintiff alleges Defendant Bradley gave Plaintiff's complaint to Defendant Griego and told Plaintiff to go into Defendant Griego's office.  This does not support a conclusion that Defendant Bradley retaliated against Plaintiff.   And Plaintiff's allegation that Defendant Bradley *allowed* Defendant Griego to retaliate is vague and conclusory.  Thus, the Court will dismiss the retaliation claim against Defendant Bradley.

Plaintiff only alleges Defendant Valenzuela was present when Defendant Griego allegedly retaliated against Plaintiff; he does not allege that Defendant Valenzuela

personally retaliated against Plaintiff. Moreover, Defendant Valenzuela's failure to report Defendant Griego's conduct to the warden or corporate officers does not constitute retaliation. Thus, the Court will dismiss the retaliation claim against Defendant Valenzuela.

### D. Count Three

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment. To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. *Jett*, 439 F.3d at 1096. Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to

deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference.  *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be substantial.  The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

### 1.    Defendant Mee

Plaintiff contends he filed a grievance with the State of Hawaii, but Defendant Mee denied it and stated that Plaintiff's improvements from glucosamine were from a placebo effect.  This is a difference of opinion, not deliberate indifference.  *Sanchez*, 891 F.2d at 242.  Thus, the Court will dismiss without prejudice Defendant Mee.

### 2.    Defendant Fuller

Plaintiff alleges Defendant Fuller examined Plaintiff, told a nurse to leave when Plaintiff returned to the medical department two days later, examined Plaintiff herself, and rejected Plaintiff's assertion that the blood in his eye was caused by blacking out and having a seizure a month earlier.  This does not constitute deliberate indifference to a serious medical need.  Thus, the Court will dismiss without prejudice Defendant Fuller.

### 3.    Defendant McCray

Plaintiff claims Defendant McCray lied about Plaintiff's test results, ignored test results that indicated a possible problem, ignored the fact that she witnessed Plaintiff having a hard time breathing, failed to properly treat Plaintiff due to profit margins, and told Plaintiff to meditate and pray.  At best, Defendant McCray may have been negligent regarding Plaintiff's test results and breathing.  However, negligence does not constitute deliberate indifference. *See Broughton*, 622 F.2d at 458; *Clement*, 220 F. Supp. 2d at 1105. Absent more, Plaintiff's allegations do not support a deliberate indifference claim against Defendant McCray.  Thus, the Court will dismiss without prejudice Defendant McCray.

…

…

1

### 4.     Defendant Morgan

2      Regarding Defendant Morgan, Plaintiff reiterates the allegations he made against

3   Defendant McCray, but also claims Defendant Morgan placed his health at risk and

4   prolonged his pain when she made him leave the medical department without hearing his

5   symptoms and told other medical staff that he was a hypochondriac.

6      As was the case with Defendant McCray, Defendant Morgan may have been

7   negligent regarding Plaintiff's tests and breathing, but this does not rise to the level of

8   deliberate indifference.  Telling Plaintiff to leave the medical department because they did

9   not have time to go over his symptoms, after Plaintiff had already spent time discussing his

10  issues with Defendant McCray, does not constitute deliberate indifference.  And telling

11  other medical staff that Plaintiff was a hypochondriac is, at best, a difference of opinion

12  between Plaintiff and Defendant Morgan regarding Plaintiff's issues.  This is not deliberate

13  indifference either.  Thus, the Court will dismiss without prejudice Defendant Morgan.

14

### 5.     Defendant Hegmann

15     For the most part, Plaintiff's allegations against Defendant Hegmann reflect

16  difference of opinion between Plaintiff and Defendant Hegmann regarding his medical

17  issues.  However, a difference of opinion does not constitute deliberate indifference.  In

18  addition, Defendant Hegmann's refusal to see Plaintiff and conduct additional tests after

19  Plaintiff's CT scan indicated he did not have a brain tumor might constitute negligence or

20  medical malpractice, but does not rise to the level of deliberate indifference.  Defendant

21  Hegmann's statement that he wanted Plaintiff "put in seg[regation]" does not constitute

22  deliberate indifference, especially in light of the fact that Plaintiff does not allege he was

23  actually put in segregation because of Defendant Hegmann's comment.

24     Plaintiff alleges Defendant Hegmann told Plaintiff to "self[-]select" rather than

25  prescribe an allergy diet for headaches from monosodium glutamate because "the facility

26  doesn[']t like us writing too many diets."  Plaintiff does not, however, indicate when this

27  allegedly occurred, what information he had provided Defendant Hegmann, or how

28

denying the allergy diet rose to the level of deliberate indifference to a serious medical need.

Thus, the Court will dismiss without prejudice Plaintiff's deliberate indifference claim against Defendant Hegmann.

### 6.    Defendant Barajas and Thomas

Plaintiff contends Defendants Barajas and Thomas denied his grievances and allowed the staff to "choose profits over treatment."  Plaintiff does not indicate what information was in the grievances, what explanation, if any Defendants Barajas and Thomas each gave for denying his grievances, or how that denial rose to the level of deliberate indifference.  Absent more, Plaintiff's allegations are too vague and conclusory to state a deliberate indifference claim against either Defendant.  Thus, the Court will dismiss without prejudice Plaintiff's deliberate indifference claim against Defendants Barajas and Thomas.

## IV.    Warnings

### A.    Address Changes

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

### B.    Copies

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files.  Fed. R. Civ. P. 5(a).  Each filing must include a certificate stating that a copy of the filing was served.  Fed. R. Civ. P. 5(d).  Also, Plaintiff must submit an additional copy of every filing for use by the Court. *See* LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

### C.    Possible Dismissal

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice. *See Ferdik v. Bonzelet*,

963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)     Count Three is **dismissed** without prejudice.

(2)     Defendants Bradley, Hegmann, Valenzuela, McCray, Fuller, Morgan, Barajas, Mee, Komori, and Bechler are **dismissed** without prejudice.

(3)     Defendants Thomas, Griego, and Lopez must answer the First Amendment claim in Count One.  Defendant Griego must also answer Count Two.

(4)     Within 120 days from the filing date of this Order, Plaintiff must file a "Notice of Substitution," substituting Defendant Trinity Food Service Supervisor Unknown's actual name.  The Court may dismiss without prejudice Defendant Trinity Food Service Supervisor Unknown if Plaintiff fails to timely file a notice of substitution, unless Plaintiff seeks and is granted an extension of time.

(5)     The Clerk of Court must send Plaintiff a service packet including the First Amended Complaint (Doc. 7), this Order, and both summons and request for waiver forms for Defendants Thomas, Griego, and Lopez.

(6)     Plaintiff must complete and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(7)     If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and First Amended Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(8)     The United States Marshal must retain the Summons, a copy of the First Amended Complaint, and a copy of this Order for future use.

(9)     The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the

Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this Order.

(10)   A Defendant who agrees to waive service of the Summons and First Amended Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

(11)   The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

(a)   personally serve copies of the Summons, First Amended Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

(b)   within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant.  The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, First Amended Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(12)   Defendants Thomas, Griego, and Lopez must answer the relevant portions of the First Amended Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

1        (13)    Any answer or response must state the specific Defendant by name on whose

2   behalf it is filed.  The Court may strike any answer, response, or other motion or paper that

3   does not identify the specific Defendant by name on whose behalf it is filed.

4        (14)    This matter is referred to Magistrate Judge Eileen S. Willett pursuant to Rules

5   72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as

6   authorized under 28 U.S.C. § 636(b)(1).

7        Dated this 2nd day of September, 2021.

8

9

10                                                _____

11                                              Dominic W. Lanza
                                            United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28